**CAROLINA POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 13201.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1969.

Decided Jan. 7, 1970.

Charles F. Rouse, Raleigh, N. C., for petitioner.

William H. Arkin, Atty., Federal Power Commission (Richard A. Solomon, Gen. Counsel, Peter H. Schiff, Sol., and Drexel D. Journey, Asst. Gen. Counsel, on the brief) for respondent.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Under the Federal Power Act, section 301, 16 U.S.C. § 825, every public utility is required to "keep * * * such accounts, records of cost-accounting procedures * * * as the Commission may by rules and regulations prescribe * * *." Carolina Power & Light Company is admittedly a generator, distributor and seller of electric energy in North and South Carolina subject to the Commission's jurisdiction. § 201, 16 U.S.C. § 824. It now petitions under § 313(b), 16 U.S.C. § 825l(b), for review and reversal of a Commission order which directed the company to apportion between operating and non-operating accounts the annual payments it makes for the use of the distribution system of Elm City, North Carolina.[1] Denying the company's attempt to charge the *whole* of each payment as an operating cost, we affirm the order.

There is no contention on the facts. By an agreement dated December 28, 1967, the company took over for twenty years the City's wires, poles and appurtenances, binding itself to pay for their use an average of $18,000 annually —an aggregate of $360,000. At the same time the company covenanted to maintain the distribution system throughout the period.

In addition, the agreement gave the company discretion to retire and replace any part of the system. These substitutions, with any other improvements and extensions, become the company's property. Parenthetically, it may be noted that no more than ten or fifteen per cent of the City's distribution system will remain in place at the end of the contract period.

A further stipulation between the City and the company was that upon expiration of the initial twenty years, a new contract would be made or the City could purchase the company property. Failing exercise of either option, the company was obligated to purchase the City's remaining electric distribution property and to continue to furnish electricity to the public for an additional sixty years.

In January 1968, the agreement received the requisite approval of the Commission, § 203, 16 U.S.C. § 824b. However, it reserved for future settlement the present accounting problem.

As it did before the Commission, the company contends that the written instrument is a genuine lease. As such the utility argues that each payment is indivisibly and exclusively chargeable as an operating expense, under the Commission's Uniform System of Accounts, to Account 589, Rents, 18 CFR pt. 101 at p. 254. This particular item is explained more fully in the System of Accounts under Operating Expense Instruction 3, 18 CFR pt. 101 at p. 192, which provides:

"3. *Rents*

A. The rent expense accounts provided under the several functional groups of expense accounts shall include all rents * * * for property used in utility operations, * * *"

However, in the circumstances, the Commission did not think this instruction apposite. It did not pass upon the company's contention that the contract was a lease and not a purchase. For ac-

1. Federal Power Commission's Opinion No. 548, Docket No. E-7394 (October 29, 1968), 40 FPC 1122.

counting purposes the Commission looked to the effect of the agreement, and said that no matter its legal character, the transaction should be recorded as an acquisition pursuant to Electric Plant Instruction 5 of the Uniform System of Accounts. 18 CFR pt. 101 at p. 184. This provision details the accounting treatment to be given when "an operating unit or system is *acquired* by purchase, merger, consolidation, liquidation, or *otherwise*, * * *" [Accent added.]

In this instruction the Commission follows its fundamental tenet that consumers should pay only once for property devoted to the public use. As the most effective means of accomplishing this aim, the Commission primarily uses the "original cost" theory of evaluating utility property for rate-making purposes. Operating expenses aside, under the principles of "original cost", the utility rates assure the owner of a fair return on the investment and of a sum sufficient to meet the current depreciation on the existing plant and any additions.

If a return and depreciation were allowed on sums beyond the original cost of the plant and additions, then a new owner in paying an inflated cost for the property would defeat the "original cost" pattern. The consumer through his rates would, of course, pay for the original cost of the property, but, in effect, he would also be forced to pay for the change of ownership. Not embodied in the plant or physical improvements to it, this sum, representing the excess of acquisition cost over original cost, brings the consumer no proven benefit.

Presently, the accounting plan of the company could allow this character of excessive recovery under the guise of rent paid. While, in the company's treatment, the depreciated original cost of the property would be preserved, operating expenses would be swelled $18,000 annually. This added expense, if passed on to the consumers in full, could embrace both the legitimate costs incurred in running the system and the charges for which the consumers receive no benefits. The effect would be to increase the consumers' rates without an adequate corresponding advantage to them.

Forebodings of the dangers we have alluded to appear in the Commission's dissection of the agreement, as reported by its Examiner as follows:

| | |
|---|---:|
| The original historical cost of the City's facilities was estimated at | $134,801.00 |
| The accrued depreciation was estimated at | 69,854.00 |
| Leaving a depreciated original cost of | $64,947.00 |
| Whereas, the present value of the twenty years of payments at $18,000 annually, aggregating $360,000, discounted at 6½%, amounted to | $212,219.00 |

The payments under the agreement, notably, are far in excess of the depreciated original cost.

To avoid these risks, the Commission set up the accounting system of which the company complains. It began with the depreciated original cost of the distribution system stated by the Examiner. It then determined (a) the taxes payable, (b) an allowance for annual depreciation calculable on the depreciated original cost, and (c) a fair return on the investment. The total of these items was the only part of the yearly payment of $18,000 permitted to be charged to operating expenses. After these charges there remained an average of $10,693 of each annual payment and this remainder was carried into a non-operating expense account, thereby dispelling the threat of a large overcharge to the consumers.

The formula employed is not impermissible under the Act. Section 301, 16 U.S.C. § 825 declares: "The Commission * * * may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited." See California Oregon Power Co. v. Federal Power Commission, 150 F.2d 25, 27 (9 Cir. 1945); cert. denied 326 U.S. 781, 66 S.Ct. 336, 90 L.Ed. 473 (1946); Northwestern Electric Co. v. Federal Power Commission, 125 F.2d 882, 886 (9 Cir. 1942), 134 F.2d 740, 744

(9 Cir. 1943), aff'd 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944).

The company availed itself of its opportunity under the Act to be heard upon its objection to the accounting prescribed by the Commission. However, this statute provides further, "[t]he burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, * * *" § 301, 16 U.S.C. § 825. The company offered no justification acceptable to the Commission. The decision of the Commission must stand.

Affirmed.