**MONTANA POWER COMPANY,**
Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 76–2726.

United States Court of Appeals, Ninth Circuit.

June 22, 1979.

Rehearing and Rehearing En Banc Denied Aug. 24, 1979.

---

William J. Madden, Jr., Debevoise & Liberman, Washington, D. C., for petitioner.

Drexel D. Journey, Gen. Counsel, FERC, Lynn N. Hargis, FERC, Washington, D. C., for respondent.

Before HUFSTEDLER, GOODWIN, and WALLACE, Circuit Judges.

HUFSTEDLER, Circuit Judge:

This case presents the novel question whether the Federal Power Commission (now the Federal Energy Regulatory Commission) may prevent an electric utility from including in its rate base, for accounting purposes, the total cost of acquiring an electric transmission line from a railroad. The Montana Power Company petitions for review, pursuant to 16 U.S.C. § 825*l*(b), of an order issued by the Federal Power Commission ("FPC") on April 19, 1976, which approved the company's purchase of a railroad's 100 kv transmission line, while rejecting the Company's proposed accounting treatment of the transaction. The FPC order permitted Montana Power to include in its rate base account only the portion of the purchase price that represented the depreciated original cost of the line to the railroad that had built it. The difference between the acquisition cost and depreciated original cost was ordered placed in a non-rate base account to be amortized to

operating expense. Following the Commission's denial of a rehearing, Montana Power petitioned for review, challenging the accounting treatment ordered by the FPC.

## I

The transmission line acquired by Montana Power was built in 1916 by the Chicago, Milwaukee, St. Paul & Pacific Railroad to provide power for its electrified railroad operations in a remote area of western Montana. Montana Power furnished all electricity used on the 350-mile transmission line, which was owned, maintained, and operated entirely by the railroad. As the population of western Montana grew, the railroad permitted Montana Power to tap into the transmission line to provide electricity to its retail customers in the area. Montana Power was permitted to use the line free of charge, while the railroad continued to bear all costs of maintenance and operation.

On June 16, 1974, the railroad shifted from electric to diesel locomotives along the route served by the transmission line. The railroad proposed to dismantle the transmission line, unless the power company purchased it. At that time, Montana Power was using the line to transmit electricity to approximately 6,500 customers and one rural electric cooperative. Rather than construct a new transmission line, at an estimated cost of $6,000,000, Montana Power

chose to purchase the existing line from the railroad for $3,250,000.[1] The transaction was completed on July 15, 1974, after Montana Power had informed the FPC of its intention to purchase the line and its belief that the transaction did not require FPC approval.[2]

On December 11, 1974, Montana Power requested the FPC to permit it to record the full $3,250,000 purchase price of the transmission line in its rate base account, from which the company is entitled to earn a return on its investment. The company noted that because it was the first electric utility to own the transmission line, the capital cost of the line had never been borne by electric utility customers. The company also argued that if it had constructed a new, and more expensive transmission line, it would have been entitled to place the full cost of construction in its rate base account.

On September 26, 1975, the FPC ordered Montana Power to show cause why the Commission should not find that the acquisition of the transmission line required FPC approval under section 203 of the Federal Power Act.[3] The FPC reserved consideration of the accounting treatment of the transaction until the jurisdictional issues were resolved. On January 5, 1976, Montana Power applied to the Commission for an order disclaiming jurisdiction over the acquisition or, alternatively, an order approving the acquisition. On April 19, 1976,

---

1. Montana Power also paid $12,402 for engineering costs connected with the purchase of the transmission line. In addition, the power company agreed to pay the railroad an annual fee of $100 per mile for an easement over the railroad's right-of-way.

2. On May 22, 1974, Montana Power notified the FPC by mail of the proposed transaction. Noting that the railroad was not subject to FPC jurisdiction, the company took the position that the transaction did not require FPC approval under section 203(a) of the Federal Power Act, 16 U.S.C. § 824b. On June 21, 1974, the FPC advised Montana Power to submit an application for an order authorizing the transaction. On July 2, 1974, Montana Power informed the FPC that it did not believe FPC approval of the transaction was necessary. The FPC reiterated its assertion of jurisdiction by letter of August 15, 1974, to Montana Power.

3. Section 203 of the Federal Power Act, 16 U.S.C. § 824b, provides in pertinent part: "No public utility shall sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $50,000, or by any means whatsoever, directly or indirectly, merge or consolidate such facilities or any part thereof with those of any other person, or purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so." While it is not entirely clear that the transaction between Montana Power and the railroad was covered by this section, the utility does not appeal from the FPC's determination that it has jurisdiction over the transaction.

the FPC approved the acquisition, but required Montana Power to exclude all but the depreciated original cost of the transmission line from its rate base account. The effect of the FPC order is that only $156,117 of the total of $3,250,000 purchase price may be included in the rate base account. The bulk of the purchase price was recorded in an account that is amortized over the remaining life of the transmission line as an annual operating expense.

## II

Congress has granted the FPC broad authority to prescribe accounting procedures for public utilities. Section 301(a) of the Federal Power Act, 16 U.S.C. § 825, requires public utilities to "make, keep, and preserve . . . such accounts . . . as the Commission may by rules and regulations prescribe as necessary or appropriate . . . ." This legislation authorizes the FPC to "determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited." (16 U.S.C. § 825(a).)

Pursuant to its statutory authority, the FPC has adopted a Uniform System of Accounts Prescribed for Public Utilities. (18 C.F.R. Part 101 (1978).) The FPC accounting regulations require utilities to record the value of their electric plant on an "original cost" basis. "Original cost" is defined as "the cost of such property to the person first devoting it to public service." (18 C.F.R. Part 101, "Definitions" (1978).) Thus, when a utility constructs a new transmission line, the cost of construction is recorded as the original cost and may be included in a rate base account. When a utility acquires property already devoted to public service, the original cost principle again governs the accounting treatment of the transaction. Thus, regardless of the acquisition cost, the acquiring utility can include in its rate base account only that portion of the purchase price that represents the depreciated original cost of the property to the previous owners. Because

the transmission line Montana Power acquired had already been devoted to public service by the railroad, the FPC permitted Montana Power to include in its rate base only the railroad's depreciated original cost of the line.

Montana Power argues initially that the FPC order is inconsistent with the FPC's accounting regulations and previous decisions of the Commission. Montana Power notes that while the Uniform System of Accounts defines "original cost" as "the cost of such property to the person first devoting it to *public service*," another portion of the regulations (Electric Plant Instruction 2A) instructs the utilities to record plant acquisitions "at the cost incurred by the person who first devoted the property to *utility service*." (18 C.F.R. Part 101 (emphasis supplied).) Moreover, Montana Power observes that in two previous cases (*Virginia Electric & Power Co.* (1967) 38 FPC 487; *Black Hills Power & Light Co.* (1968) 40 FPC 166) the FPC permitted utilities that acquired transmission lines from nonutilities to include the full acquisition costs in their rate base accounts.

■ Despite the apparent conflict in the wording of the accounting regulations, the FPC has consistently interpreted them to require that acquisitions be recorded at the cost to the person first devoting the property to public service. The FPC's interpretation of the accounting regulations is controlling. As the Supreme Court noted in *Bowles v. Seminole Rock Co.* (1945) 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." The Commission has consistently adhered to its interpretation of the regulations. In both *Virginia Electric & Power Co., supra*, and *Black Hills Power & Light Co., supra*, the acquiring utility was permitted to include its entire acquisition cost in its rate base account only because "the line [had] not previously been devoted to the public ser-

vice." (38 FPC at 488; 40 FPC at 166.)[4] Thus, the only question before us is the validity of the FPC's accounting regulations.

### III

■ In reviewing the validity of FPC accounting regulations, we must bear in mind that we cannot disturb the FPC's order unless it is so arbitrary and capricious . as to constitute an abuse of discretion. (*American Telephone & Telegraph Co. v. United States* (1936) 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142; *Pacific Power & Light Co. v. FPC* (9th Cir. 1944) 141 F.2d 602.) To constitute an abuse of discretion "it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles of correct accounting' as to be the expression of whim rather than an exercise of judgment." (*American Telephone & Telegraph Co. v. United States, supra*, 299 U.S. at 236–37, 57 S.Ct. at 172, citations omitted.)

Montana Power argues that it is arbitrary and irrational to prevent it from including the entire acquisition cost of the transmission line in its rate base account. The power company notes that there is no allegation that the purchase price of the transmission line was artificially high or that the transaction was designed to inflate the utility's rate base. Montana Power's customers have never paid for the transmission line. If Montana Power had chosen to construct a new and more expensive transmission line, the entire cost of construction would have been recorded in their rate base account. Thus, the power company argues that the FPC accounting order encourages utilities to make wasteful and duplicative capital investments, instead of using existing transmission facilities.

We sympathize with Montana Power's arguments based on the peculiar circumstances surrounding Montana Power's acquisition of the railroad's transmission line. Once the railroad decided to shift to. diesel locomotives, Montana Power was confronted with a decision about how to continue to provide service to its existing customers who were served by the railroad's transmission line. The utility faced only two realistic choices: to purchase the railroad's line or to construct a new and more expensive line of its own. We believe that Montana Power made the proper choice and that it is unfortunate that the power company is penalized by the FPC's accounting regulations.

The FPC justifies its use of original cost accounting in part on the grounds that it is necessary to prevent consumers from paying twice for the same asset. Because the railroad's customers had already paid for the construction of the transmission line, the utility's customers should not also be required to provide the utility with a return on its investment in the line. The FPC contends that its accounting regulations may properly be designed to protect consumers from such double payments.

■ While other courts have accepted . the double payment rationale (*Carolina Power & Light Co. v. FPC* (4th Cir. 1970) 433 F.2d 158), we do not consider it very persuasive. Although it is true that the railroad's customers had already paid for the transmission line, that fact does not distinguish them from the customers of the oil company in *Black Hills Power & Light Co.* or the taxpayers who financed the pumping plant power line acquired in *Virginia Electric & Power Co.* Customers of all industries, regulated and unregulated, ultimately bear the cost of their vendors' plant facilities. The task of regulation is to prevent consumers from bearing more than their fair share of this burden in industries where competitive forces do not otherwise

---

4. In *Virginia Electric & Power Co., supra*, the FPC approved a utility's acquisition of a transmission line that had been used by the Government to supply power to a government pump-ing plant. In *Black Hills Power & Light Co., supra*, a utility purchased a transmission line from a private oil company.

protect them.[5] When facilities previously paid for by ratepayers are later sold at a gain, regulatory authorities may properly determine the extent to which consumers should share the gain. (*Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission* (1973), 158 U.S.App.D.C. 7, 485 F.2d 786.)

Despite the attractiveness of Montana Power's arguments, we must recognize that the power company's plight is produced by features inherent in the concept of original cost accounting. Because the market value of assets seldom changes precisely in accordance with depreciation, depreciated original cost often is not an accurate proxy of current fair market value. Nonetheless, original cost accounting is employed to avoid the difficulties of more subjective methods of property valuation.[6] The original cost method has been applied to property acquisitions by utilities to prevent utilities from artificially inflating their rate bases by acquiring properties at unrealistically high prices. As the FPC has noted, if the original cost concept was not applied to such acquisitions, "all that need be done to raise rates and obtain greater income would be to have one company buy utility properties from another at a higher price than original cost and in this very simple way increase the size of the rate base and increase the cost of service to consumers." (*United Gas Pipe Line Co.* (1961) 25 FPC 26, 64.)

Reviewing courts have consistently upheld the application of the original cost rule to property acquisitions by utilities. In *Pacific Power & Light Co. v. FPC, supra,* 141 F.2d 602, we affirmed an FPC order requiring a utility to exclude from its rate base the portion of the cost of an acquisition of a number of utility systems that was in excess of original cost. We again affirmed an FPC order excluding the excess of acquisition cost over original cost from a utility's

rate base in *California Oregon Power Co. v. FPC* (9th Cir. 1945) 150 F.2d 25. The purpose of the FPC accounting regulations, we observed, "was not merely to enable the Commission to compile and require the recording of informative data. The aim was to eliminate the padding from utility accounts. The provision has the broad purpose of protecting the public against artificially inflated investment costs on the basis of which utility companies assert the right to a return." (150 F.2d at 28.)

There is no allegation in this case that Montana Power attempted to artificially inflate its rate base when it acquired the transmission line from the railroad. Yet the purpose of the FPC's original cost accounting rules is to obviate the need for such allegations. By permitting utilities to include in their rate base accounts only the depreciated original cost of acquisitions, the FPC rules provide an objective method of valuation without the need for independent assessments of the fair market value of individual acquisitions. Disparities between actual market value and depreciated original cost may produce unfortunate results in individual cases, but this has not been held to preclude the FPC from using original cost accounting. Montana Power concedes that the interest of the FPC in preventing artificial inflation of utility rate bases justifies application of the original cost rules to property transfers between utilities. We fail to see why this same interest cannot justify application of the rules to utility acquisitions from regulated non-utilities.

We cannot disturb the FPC's order unless it is so arbitrary and capricious as to constitute an abuse of discretion. (*American Telephone & Telegraph Co. v. United States, supra,* 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142; *Pacific Power & Light Co. v. FPC, supra,* 141 F.2d 602.) As the Supreme Court has observed, "[i]t is not for us to determine what is the better [accounting]

---

**5.** *See* Kohler, "Development of Accounting for Regulatory Purposes by the Federal Power Commission," 14 Geo.Wash.L.Rev. 152, 169 (1945).

**6.** *Id.* at 163.

practice so long as the Commission has not plainly adopted an obviously arbitrary plan." (*Northwestern Electric Co. v. FPC* (1944) 321 U.S. 119, 124, 64 S.Ct. 451, 454, 88 L.Ed. 596.) We have also noted that "[i]t is not for the courts to resolve differences of opinion among accounting authorities. 'What has been ordered must appear to be "so entirely at odds with fundamental principles of correct accounting" * * * as to be the expression of a whim rather than an exercise of judgment.' *American T. & T. Co. v. United States,* 299 U.S. 232, 236 [57 S.Ct. 170, 172, 81 L.Ed. 142.]" (*Pacific Power & Light Co. v. FPC, supra,* 141 F.2d at 605 (citation omitted).)

In light of the wide latitude courts must accord the Commission in the adoption of accounting regulations, we are constrained to affirm the Commission's order. We cannot say that the FPC abused its discretion by requiring original cost accounting for all acquisitions from regulated entities, rather than for solely acquisitions from utilities. Although application of this principal in the peculiar context of this case may produce unfortunate consequences, we cannot overturn the Commission's order. The authority of this court "to affirm, modify, or set aside" FPC orders "in whole or in part" (16 U.S.C. § 825*l*(b)), is not "power to exercise an essentially administrative function." (*FPC v. Idaho Power Co.* (1952) 344 U.S. 17, 21, 73 S.Ct. 85, 97 L.Ed. 15.) Regardless of our views of the wisdom of the Commission's order, we cannot say that it was so arbitrary "as to be the expression of a whim rather than an exercise of judgment." Therefore, we must decline the invitation to intervene in the promulgation of accounting policy for public utilities. To do so would be to exercise a function that courts are ill-suited to perform and one that Congress has properly entrusted to the expertise of an administrative body.

In affirming the Commission's order, we note that it governs only the accounting treatment of Montana Power's acquisitions, and not the question whether Montana Power will ultimately be entitled to earn a rate of return on its entire investment in acquiring the transmission line.[7] The Commission concedes that since this case does not involve review of a rate-making order, Montana Power is not foreclosed from demonstrating in a subsequent rate-making proceeding that it should be entitled to earn a return on its full investment. We intimate no view on the merits of any claim Montana Power may make in a subsequent rate-making proceeding. As we said in *Pacific Power & Light,* "[i]t is complained . . . that the elimination of the acquisition cost of these intangibles from the fundamental accounts of the utility distorts its base for rate-making purposes. However, this is not a proceeding for the fixing of rates. The order does not prohibit the keeping of other accounts and Pacific may maintain a record of the acquisition cost of these intangibles for whatever such record may be worth . . . ." (141 F.2d at 605.)

AFFIRMED.

GOODWIN, Circuit Judge, dissenting:

While Judge Hufstedler writes a more persuasive case for affirming the FERC than the agency presented in its briefs or argument, I dissent.

Like the majority, I look to see whether the accounting treatment contested here is "the expression of a whim rather than the exercise of judgment." *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936). *See also Northwestern Electric Co. v. FPC,* 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944). Since Mr. Justice Cardozo laid down this general guideline, other cases have sharpened the test, indicating specific factors we look for to satisfy ourselves that discretion, not whimsy, produced the action complained of. I do not find these factors present here.

---

7. The Commission's order included the proviso that "[t]he foregoing authorization is without prejudice to the authority of this Commission or any other regulatory body with respect to rates, service, accounts, valuation, estimates or determinations of costs, or any matter whatsoever now pending or which may come before this Commission."

The courts must, of course, accord an administrative agency considerable latitude to set policy in the areas in which it has statutory responsibilities. This truism does not mean, however, that courts should hesitate to intervene when the agency has clearly failed to make a reasoned decision.

"* * * The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts * * *.

"Its supervisory function calls on the court to intervene * * * if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decisionmaking." *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) (footnotes omitted).

More succinctly stated, the courts fulfill the review function assigned them by statute only when they "hold the agency to its duty to give reasoned consideration to the facts and issues material to its determinations." *Public Service Commission v. FPC*, 167 U.S. App.D.C. 100, 116, 511 F.2d 338, 354 (1975) (footnote omitted).

The FERC has articulated no rationale for applying its accounting rule to this acquisition, nor can it show that its own cases or accounting standards have consistently applied the rule. Moreover, the agency has not addressed a crucial issue here: the effects of its rule on public utilities' future acquisition decisions.

## I.

The FERC's brief bristles with claims that its decision in this case was rational.

The Commission argues forcefully that its accounting order prevents utility customers from paying twice[1], an argument that the majority does not consider "very persuasive". The argument is, in fact, nonsense. Those who paid for the line were railroad customers, a very small number among the many ratepayers of the electric utility. In other words, few of the utility's customers have paid once, but the FERC claims its rule is needed to prevent their paying twice.

The Commission also claims it based its decision on "an evaluation of the public interest as a whole." In support of that claim, however, it cites only cases in which sellers artificially wrote up the value of their acquisitions to increase the size of their rate base. *E. g., California Oregon Power Co. v. FPC*, 150 F.2d 25, 27 (9th Cir. 1945), *cert. denied*, 326 U.S. 781, 66 S.Ct. 339, 90 L.Ed. 473 (1946). The Commission admits that no such irregularity has occurred here. Indeed, Montana Power could have paid $6 million elsewhere for the sort of line it acquired for some $3 million from the railroad, and quite legitimately included the entire $6 million in its rate base. It chose instead *not* to include that amount in its rate base, a choice for which the Commission now penalizes it.

Third, the accounting order is defended as preventing "possible abuse" of a type the Federal Power Act, 16 U.S.C. § 824 *et seq.*, was promulgated to stop. Nowhere does the FERC show us that Congress felt that inter-industry acquisitions presented the likelihood of abuse that intra-industry transfers may once have presented. The FERC does not contend that any such abuse is present here, or even that it is a problem generally in inter-industry sales.[2] The Commission does not even attempt to justify the rule on the grounds of administrative

---

1. "[T]he public had already been paying the railroad a return upon investment * * *. [I]t would be inappropriate to burden the public a second time with paying a rate of return * * *."

2. None of the reasons for the original-cost rule given in *United Gas Pipeline Co.*, 25 FPC 26 (1961), which the FERC says is its definitive statement on the need for the rule in intra-industry sales, is present in this case.

efficiency in reviewing such transfers. We thus find ourselves in the awkward position of upholding a per se rule on the basis of conduct that (as far as we know from the FERC) has not occurred, is not likely to, and could be policed with a less drastic and more sensible rule if it did.

## II.

The FERC next argues that established Commission precedent and policy support its rule. Mere incantation of the phrase "established precedent and policy", without an affirmative showing that precedent and policy sustain the Commission's action, does not satisfy the test of rationality. *City of Willcox v. FPC*, 185 U.S.App.D.C. 287, 299 n. 8, 567 F.2d 394, 406 n. 8 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *American Smelting and Refining Co. v. FPC*, 494 F.2d 925, 944–45 (D.C. Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). Here, the case law and accounting regulations to which the FERC points are confused and contradictory.

If anything, the case law is more supportive of Montana Power than of the Commission. As the majority notes, in the cases where the question has been presented the FERC has permitted utilities acquiring transmission lines from nonutilities to accrue the entire cost to the rate-base account. *Black Hills Power & Light Co.*, 40 FPC 166 (1968); *Virginia Electric & Power Co.*, 38 FPC 487 (1967).

The FERC claims that this is a special case because the seller, while not a power utility, had already devoted the line to "public service". But this was true in *Virginia Electric & Power Co.*, in which the seller was the federal government. Its line was more engaged in "public service" than the line used by the privately owned railroad here. I therefore cannot agree with the majority's view that the FERC has consistently interpreted its regulations to re-

quire original-cost accounting when a line was previously devoted to public service.

Finally, the FERC defends the accounting rule as consistent with the agency's Uniform System of Accounts, 18 C.F.R. pt. 101 (1978). That depends on which section of the regulations one looks at. Under Electric Plant Instruction 2A, Montana Power should be entitled to include the line in its rate base at the full acquisition cost, as the seller was not a power utility:

> "All amounts included in the accounts for electric plant acquired as an operating unit or system * * * shall be stated at the cost incurred by the person who first devoted the property to utility service."

On the other hand, Instruction 1C can be read as requiring that the line be included, not at cost, but at original cost as the Commission maintains. The FERC is wrong, therefore, in claiming that its rule is consistent with the Uniform System, because the regulations are themselves inconsistent.[3]

## III.

None of the purported rationales offered by the FERC for its rule makes sense to me; nor do I find useful precedent in either the agency decisions or its accounting standards. More telling, however, is the agency's lack of consideration of the rule's longer-run effects.

This should be the most critical issue for the FERC. The case is one of first impression. The result next time will be the scrapping of a perfectly good transmission line and the construction of a new one for double or triple the cost. The FERC, for all its avowed concern about some consumers' possible double payment, ignores the probability of saddling all future consumers with a larger single payment.

Economists have found that, because utilities are allowed a return only on their rate

---

**3.** The Commission urges that "cost" as used in Instruction 2A really means "original cost", so that Instructions 2A and 1C would be consistent. This is an unlikely reading. Definitions 8 ("Cost") and 20 ("Original cost") appearing before the Electric Plant Instructions make a clear distinction between the two concepts.

base, they have developed an "edifice complex", padding their rate bases. *See, e. g.*, Averch & Johnson, *Behavior of the Firm Under Regulatory Constraint*, 52 Amer. Econ.Rev. 1052 (1962). Fear of utilities' inflating the rate base led to the per se original-cost rule in intra-industry sales. The FERC would now extend the rule to a truly arm's-length sale when the obvious effect of extension in the future will be greater inflation of rate bases.

Adoption of a rule which produces a result precisely opposite to that supposedly intended is the ultimate caprice. It would be one thing if the case law bound us. But, as Judge Hufstedler's opinion correctly states, the relevant line of precedent includes cases that support Montana Power. The FERC could easily live with rules that better fit both the cases and the realities of producing electricity.

The case underscores, too, a curious notion of the "public interest" that the FERC claims to be protecting. Society as a whole will only be worse off for the FERC's rule. In a comparable future situation, the electric utility will have an incentive to let the railroad scrap a line that the utility will then replace by consuming $6 million worth of society's scarce resources. Despite its protestations that it is serving the public interest, the FERC's wooden accounting rule will defeat that interest.

Congress has delegated much authority to the Commission, but to avoid the bureaucratic arrogance that tends to infect unbridled authority, it has also ordered us to review Commission orders. 18 U.S.C. § 825*l* (b). We may not ask that the Commission always be correct—but we must insist that it not be capricious. By affirming here, where the FERC has offered no plausible reason for its decision and invokes only confused precedent and inconsistent regulations, the majority makes me wonder how we can justify the reliance Congress placed on us.